CLERK'S OFFICE
A TRUE COPY
Mar 18, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>Devices A and B, collectively the "Target Devices", currently in law enforcement custody, as further described in Attachment A | ) | Case No. 26-M-342 (SCD) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 4-1-26 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ________.

Date and time issued: 3-18-26. 2:55 pm

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

## ATTACHMENT A
**Property to Be Searched**

The property to be searched is two cellular phones recovered from the person of LIPSEY; during his arrest outside 2319 West Michigan Street, Milwaukee, Wisconsin, on March 4, 2026, more fully described as the following, hereinafter referred as the "Target Devices":

a. a silver iPhone with beige phone case (Device A); and
b. a silver Google cellphone with beige phone case (Device B).

The Target Devices are currently possessed by Wisconsin Division of Criminal Investigation, located in Brookfield, Wisconsin.

This warrant authorizes the forensic examination of the Target Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

# ATTACHMENT B

## Particular Things to be Seized

1. All records and information on the Target Devices described in Attachment A that relate to violations of felon in possession of a firearm; possession of a firearm in furtherance of drug trafficking; distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; use of a communication facility in furtherance of a drug trafficking offense; and maintain drug involved premises, violations of Title 18, United States Code Sections, 922(g) and 924(c); and Title 21, United States Code, Sections 841, 843(b), 846, and 856, including:

a. Preparatory steps taken in furtherance of these crimes;
b. Any audio, video, photograph(s) travel records, information related to the identity of co-conspirators, and any other content or records on the phone of criminal activity for the above offenses or of evidentiary value;
c. All voicemail and call records;
d. Electronic communications of any kind, including text messages, instant messages, social media, multimedia messaging, audio messages, voicemails, communications in third party apps, and emails, between Target Subjects and known or prospective customers of the crimes under investigation or concerning the crimes under investigation or others engaged in drug trafficking;
e. All call logs;
f. Contact list, to include names, addresses, phone numbers, and/or email addresses and records of communication with those contacts including call logs and written messages of any kind;
g. All social media sites used and applications for social media sites;
h. Lists of customers and related identifying information;
i. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
j. Types, quantities, and prices of firearms possessed;
k. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
l. All bank records, checks, credit card bills, account information, and other financial records.
m. All internet activity, including all web browsing history;

n. Evidence of user attribution showing who used or owned the **Target Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, saved usernames and passwords, documents, and browsing history, user profiles, messaging logs, photographs, and correspondence;
o. Evidence of software that would allow others to control the phone, such as viruses, and other forms of malicious software;
p. Evidence indicating how and when the phone was accessed or used to determine the chronological context of access, use, and events relating to the crime under investigation and the user;
q. Records of or information about the computer's internet activity, such as firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;
r. Contextual information necessary to understand the evidence described in this attachment, such as contact lists, address books, and notes;
s. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, any downloaded applications and Internet Protocol addresses; and
t. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:
    i. records of Internet Protocol addresses used;
    ii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the case agents may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

CLERK'S OFFICE
A TRUE COPY
Mar 18, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Devices A and B, collectively the "Target Devices", currently in law enforcement custody, as further described in Attachment A

Case No. 26-M-342 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841, 846, 856; and 843(b); 18 U.C.S. 922(g) and 924(c) | Distribution/possession with intent to distribute controlled substances; conspiracy to do the same; maintain drug involved premises; and use of a communication facility in furtherance of a drug trafficking offense; felon in possession of a firearm; and possession of a firearm in furtherance of drug trafficking |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* __________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Curt R. Hansen
*Applicant's signature*

Curt Hansen, SA HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 3-18-26

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**MATTER NUMBER 2024R438**

I, United States Department of Homeland Security Investigations (HSI) Special Agent Curt Hansen, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — electronic devices which are currently in law enforcement possession — and the extraction from that property of electronically stored information described in Attachment B, based at least in part on personal observations, knowledge and reports written by other law enforcement investigators, which I consider to be truthful and reliable.

2. I am a Special Agent of HSI, assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been employed with HSI as a Special Agent for approximately four years. Prior to employment with HSI, I worked as a Deputy United States Marshal, Federal Air Marshal, and United States Border Patrol Agent. I have been a sworn federal law enforcement officer specifically investigating crimes involving narcotics, firearms, smuggling, terrorism, and immigration since September 2011. Throughout my law enforcement career, I have received training in general law enforcement and in specialized areas including narcotics and human smuggling. I am an investigator or law enforcement officer of the United States within the meaning of Title 8, United States Code, Section 1357(a)(5), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, certain offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code, and other

related offenses. Since becoming employed as a federal agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. As part of my duties and responsibilities as an HSI Special Agent, I am authorized to investigate crimes that involve narcotics violations pursuant to Title 21, United States Code.

3. As part of my duties as an HSI Special Agent, I have experience conducting criminal investigations involving narcotics, firearms, gangs, and human trafficking and have participated in the execution of search warrants in such investigations.

4. I have received training related to the investigations and enforcement of federal sex trafficking laws. As a result of this training and my experience, I am familiar with the technologies traffickers use to recruit, communicate with, and exploit their victims. These include posting online advertisements for commercial sex dates, communicating electronically with prospective commercial sex buyers, and distributing sexually explicit images and videos of trafficking victims. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

5. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. Through my training and experience, I am familiar with the way in which narcotic traffickers conduct their business, including, but not limited to: the types and amounts of drugs distributed; the types and amounts of profits made; the

methods of importing and distributing controlled substances; the use of mobile telephones, email accounts, and the Internet to facilitate their transactions; and the use of numerical codes and code words to conduct their dealings.

6. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

7. Additionally, I have received training related to the investigations and enforcement of drug trafficking laws.

8. As a result of this training and my experience, I am familiar with the technologies of drug traffickers and those engaged in human trafficking. I know that drug traffickers and/or human traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking and/or human trafficking operations. I know drug trafficking and/or human trafficking often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and conduct drug trafficking and engaged in human trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to

communicate with suppliers, customers, co-conspirators, and fellow traffickers and/or human trafficking victims, customers, co-conspirators, and fellow human traffickers. I know that drug traffickers and/or human traffickers often keep documents and records about the transportation, drug sourcing, drug ordering, drug sale, drug distribution, victim information, victim posting, posting of advertising, communication with sex trafficking customers, human trafficking proceeds, etc. These documents and records and additionally receipts, notes, ledgers, and other documents regarding drug traffickers and/or human traffickers are often maintained where the traffickers have ready access. These may be stored computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers and/or human traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, their drug proceeds, their trafficking victims, and/or customers. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such

systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

9. I am familiar with the language used over the telephone and other electronic communications to discuss sex and drug trafficking and know that the language is often limited, guarded, and coded. I am familiar with various code names used to describe controlled substances, as well as various code words used to describe commercial sex acts. I also know that drug traffickers and sex traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

10. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization to have various tasks assigned to persons involved in the organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances and/or narcotics for distribution or firearms for protection/intimidation. The persons higher in the drug trafficking organization often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement. Further, a human trafficker uses a "bottom", which I know is a slang term to refer to a female appointed by the trafficker to supervise the other human trafficking victims, and who is used by the trafficker to report "rule" violations.

The bottom tend to operate as a trafficker "right hand," and my help instruct victims, collect money, book hotel rooms, post ads, or inflict punishments on other girls at the direction of the trafficking. Traffickers use "bottoms" in order to insulate themselves, to avoid apprehension/detection from law enforcement

11. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that often times "drug houses", also called "trap houses", are established as places where drug users take up residence at one place. It is common that these "drug houses" or "trap houses" are engaged in prostitution where drugs are both used and sold. It is a common practice for drug users to trade sexual favors for drugs and / or trade sexual favors for money to buy drugs at these places. It also becomes a common practice for persons to bring stolen items to these places in the hopes to trade them for drugs or money that can be used to purchase drugs. These residences help drug dealers impede law enforcement from making observations of what is taking place inside the residence, and obfuscate criminal investigations by storing illegal drugs inside a place with multiple users of the illegal drugs, as it creates confusion as to who is the owner of the drugs inside the residence might be. These types of "drug houses" are at times run by persons that are trusted to hold drugs and money and are usually armed or given armed protection to perform this task.

12. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting an investigation into many drug investigations, and human trafficking

investigations that the cellular phone data will be a key piece of evidence based on my training and experience. Individuals who sell and use narcotics and who engage in the trafficking of others will mainly utilize their cell phone to set up a transaction utilizing their cellular phone or a special application downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those that engage in drug trafficking and human trafficking.

13. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, including surveillance recording devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

14. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come

from personal observations, training and experience, and information obtained from other investigators and witnesses.

15. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of: felon in possession of a firearm; possession of a firearm in furtherance of drug trafficking; distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; use of a communication facility in furtherance of a drug trafficking offense; and maintain drug involved premises, violations of Title 18, United States Code Sections, 922(g) and 924(c); and Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, , Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Antone A. ROSS, William D. ESKRIDGE, Raymond V. COWAN, RAYMONII Cowan, J.C., Dianne D. DALLAS, Michael LIPSEY and other persons as yet unknown (hereinafter "TARGET SUBJECTS"). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## II. IDENTIFICATION OF DEVICE TO BE EXAMINED

16. The property to be searched is two cellular phones recovered from the person of LIPSEY; during his arrest outside 2319 West Michigan Street, Milwaukee, Wisconsin, on

March 4, 2026, more fully described as the following, hereinafter referred as the "Target Devices":

A. a silver iPhone with beige phone case (Device A); and
B. a silver Google cellphone with beige phone case (Device B).

17. The applied-for warrant would authorize the forensic examination of the Target Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

18. The Target Devices are currently possessed by Wisconsin Department of Justice Division of Criminal Investigation (DCI), located in Brookfield, Wisconsin.

## III. PROBABLE CAUSE

### A. Background

19. Since May 2024, HSI has been investigating allegations that members of the DTO are conspiring with each other, and other individuals yet unknown, to operate stash houses and trap houses for the purpose of storing and distributing controlled substances in Milwaukee, Wisconsin, and using numerous properties owned by STAIR to engage in their conduct.

20. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as CS#1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment

to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

21. Special Agents of HSI, case agents and local officers have received information concerning the illegal drug trafficking activities of members of the TARGET DTO from confidential human sources (CS #1 and CS #2):

a. CS #1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS #1 began cooperating with law enforcement for consideration on pending criminal drug charges in Forest County beginning in approximately March 2025. CS #1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS #1's cooperation, on May 30, 2025, CS #1 was re-arrested on drug offenses by State Patrol in Outagamie County, and his cooperation ended. This drug conduct was not at the direction of law enforcement and was contrary to CS #1's cooperation agreement. Within the context of the information detailed and relied upon for

purposes of this application, I believe that CS #1 is credible and that CS #1's information is reliable notwithstanding CS #1's violation of CS #1's cooperation agreement.

b. CS #2 reported to the case agents with the FBI from approximately March of 2025 to the end of May 2025. In May 2025, CS #2 began cooperating with HSI. CS #2 was initially cooperating with FBI and other law enforcement officers in hopes of receiving third-party consideration for a family member on a felony criminal matter, until May 2025. No consideration has been provided to that family member. CS #2 is now cooperating in exchange for monetary consideration. To date, CS #2 has received one monetary payment of $5,000 for CS #2's cooperation with HSI. Certain information provided by CS #2 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, and a review of information contained within law enforcement databases. CS #2 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CS #2 has prior felony convictions for Robbery and Manufacture / Deliver Cocaine. I have discussed CS #2's cooperation with the law enforcement officer with whom CS #2 was working in exchange for third-party consideration. The officer indicated that CS #2 has provided reliable cooperation with that agency and believes that CS #2 is reliable. At no time during CS #2's cooperation with HSI have I found CS #2 to have provided false information or engaged in untruthful or deceptive behavior. As further detailed below, during controlled operations, the basis of CS #2's information has been confirmed by case agents and determined to be truthful and reliable. Further, CS #2's information is based on CS #2's own personal observations and participation in surveilled controlled operations. Within the

context of the information detailed and relied upon for purposes of this application, I believe that CS #2 is credible and that CS #2's information is reliable. CS #2 is currently cooperating with law enforcement.

22. At various times between April 2025, and February 2026, United States Magistrate Judges for the Eastern District of Wisconsin have authorized the use of pen registers and trap and trace devices for DTO telephone lines. At various times between April 2025, and January 2026, United States Magistrate Judges for the Eastern District of Wisconsin have signed orders for prospective precision location data (pings) for DTO telephone lines.

23. As part of the investigation, case agents have reviewed numerous recorded jail calls between in custody inmates and MCDADE and recorded jail calls between in custody inmates SINCLAIR, LOPEZ and STAIR. Case agents have identified MCDADE, SINCLAIR, STAIR, and LOPEZ by their voices, names, and other facts shared in the recordings that are consistent with MCDADE, SINCLAIR, STAIR, and LOPEZ. Case agents also identified STAIR's telephone number as (414) 732-3682; LOPEZ's telephone numbers as (414) 439-8361 and (414) 639-1158; and BOFFIL's telephone number as (262) 234-8917, further outlined below.

**B. Title III Authorization**

24. On December 19, 2025, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 439-8361 (TARGET TELEPHONE 1), used by LOPEZ and initial interception of wire communications to and from (414) 639-1158 (TARGET TELEPHONE 2), used by LOPEZ. On January 16, 2026, interceptions of TARGET TELEPHONE 1 and TARGET TELEPHONE 2 were extended and were set to end on February

14, 2026. Also on January 16, 2026, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 732-3682 TARGET TELEPHONE 3, used by STAIR, which were set to expire on February 14, 2026. On February 13, 2026 and March 13, 2026, interceptions of (414) 732-3682 TARGET TELEPHONE 3 were extended and are set to end on April 12, 2026. Through the court authorized wire and electronic interceptions, case agents identified STAIR and other S2 Real Estate employees using the business to assist drug traffickers by renting properties to drug traffickers to be used for trap house and/or stash house; assisting in warning drug traffickers of law enforcement investigations; dispatching drug traffickers to residences to deal with drug customers or removing other tenants illegally; collecting additional fees from drug traffickers for S2 Real Estates assistance in supporting the drug traffickers and their operations; and then cleaning the illegal obtained drug proceeds by using the S2 Real Estate business through employee's payroll and other methods.

**C. Identification of Properties Utilized for Narcotics Sales**

25. STAIR is the owner and operator of S2 Real Estate as well as at least 43 Limited Liability Companies in similar names. STAIR, though his LLCs, owns more than 100 rental properties throughout the greater Milwaukee area.

26. STAIR, through S2 Real Estate, employs LOPEZ and others.

27. Since approximately May 2024, case agents have been investigating the DTO, which has been connected to several overdose deaths and appears to be connected to STAIR's drug trafficking partner, MCDADE.

28. The DTO has been identified as operating out of multiple residences owned by STAIR through his limited liability companies. As part of the investigation into the DTO, case agents have identified that STAIR and LOPEZ knowingly rents properties to drug traffickers for the purpose of storing and/or selling controlled substances, among other criminal violations.

29. As part of the investigation, case agents have identified several properties owned by STAIR, which have operated as trap houses or been otherwise involved in the distribution and storage of controlled substances including 712 South 21st Street Milwaukee, Wisconsin, 1512 South 21st Street, Milwaukee, Wisconsin (the "21st Street House") and 1425 West Greenfield Avenue, Milwaukee, Wisconsin (the "14th Street House"). Case agents have connected MCDADE and others to several of these trap houses. Further, as part of the investigation into STAIR, case agents queried 2319 West Michigan Street on the City of Milwaukee Assessor's website and learned that the property is owned by STAIR.

30. Case agents obtained information from the Milwaukee Police Department (MPD) regarding drug activity at the address of 2319 West Michigan Street, Milwaukee, Wisconsin on two recent occasions. On October 17, 2025, a concerned citizen called and reported three older black males, one being bald, one short in height with a beard. The caller reported that they are selling "ice", which by on my training and experience is a street term used to refer to crystal methamphetamine, and marijuana/K2 outside of 2319 West Michigan Street, Milwaukee, Wisconsin. The caller added that she has seen these suspects with firearms.

31. On November 5, 2025, a concerned citizen called and reported to MPD that someone in 2319 W Michigan Street is actively selling drugs at all times of the day and advised that Apartment #303 was involved in those drug sales. MPD responded to the complaint, knocked

on Apartment # 303 and there was no answer. Officers did observe a ring camera affixed to the wall outside of this apartment door.

32. Case agents later obtained MPD body camera footage of recent calls for service at 2319 West Michigan Street, Milwaukee, Wisconsin. From the officer's body camera, the 1st floor northeast unit was identified as Apartment # 101. Throughout this investigation, it is known to case agents that STAIR rents apartments and houses to people for the purposes of storing/selling narcotics and prostitution. Case agents have intercepted calls between Diane DALLAS and STAIR regarding 2319 West Michigan Street where STAIR was discussing information he had received about an apartment at that location having a ring doorbell on the exterior of the apartment.

33. On January 24, 2026, between approximately 4:24 p.m. and 4:36 p.m., STAIR, at **TARGET TELEPHONE 3**, exchanged several text messages with DALLAS using (414) 419-4993 (UF4993). These texts are as follows:

> **STAIR**: I want whatever piece of s*** is in 2319 105 out immediately or I'm kicking every single one of your tenants out of every single one of my properties you're going to have to pull some magic and get rid of that guy I want him gone before the end of the month I want that place emptied if he goes to any other building we're done and I'm kicking you out of every single unitr building we're done
> **STAIR**: He has a f****** doorbell bellow his window that the drug addicts come and ring the bell and buy drugs and they're attracting drug addicts to our building and now we're going to have to worry after we kick him out that new drug dealers won't pop in
> **STAIR**: You might have to park your butts over in the parking lot and watch his window and scare away his customers that might be the best way to do it if he refuses to leave

34. At approximately 6:00 p.m., STAIR, at **TARGET TELEPHONE 3**, received a call from DALLAS using (414) 419-4993. STAIR asked, "How's it going?" The DALLAS replied, "Apartment 105?" STAIR said, "Yup. I don't know who's in

there. If you have an old man or somebody in there, then *somebody is dealing under the table*, like, they let him in. They need to be out." (emphasis added) DALLAS said, "He's handicapped." He's in the hospital in, uh, Froedtert." STAIR continued, "Then whosever there is dealing out his unit. Go and change the locks." DALLAS replied, "Yeah. That's definitely a shock to me. Let me see what's going on over there." As the conversation progressed, STAIR said, "I do not wanna see… If, if this person sees them deal one more piece of drug this week, I'm sticking to my plan. So you gotta get them out." DALLAS acknowledged.

35. Case agents believe STAIR received information that somebody was selling drugs out of 2319 W. Michigan Street Apartment #105 without his permission or knowledge ("Yup. I don't know who's in there. If you have an old man or somebody in there, then somebody is dealing under the table, like, they let him in. They need to be out."). Based on my training and experience, I know those engaged in drug trafficking will be more cautious in text message communication; however, over voice calls may be more open about the drug trafficking business. During STAIR's text message, he presents that he is angry about someone drug trafficking out of his property, but over the wire intercept, STAIR expresses his concern over the drug trafficker dealing "under the table". Based on my training and experience, I believe that this would relate to drug trafficking without STAIR's awareness and lack of ability to prohibit/benefit from this individual's drug trafficking. This is further confirmed based on other communication between STAIR and DALLAS outlined below. STAIR further claimed that this individual had a doorbell underneath the apartment unit's window that the drug user had to ring in order to obtain controlled substances (text message: "He has a f****** doorbell bellow his window that the drug addicts come and ring the bell and buy drugs…"). STAIR instructed

DALLAS to monitor the building and kick this individual out of the apartment ("I do not wanna see… If, if this person sees them deal one more piece of drug this week, I'm sticking to my plan. So you gotta get them out."). Based on this investigation, case agents are aware that STAIR knowingly rents apartments to drug dealers and that STAIR and these drug dealers have an agreement with each other. Therefore, case agents believe STAIR was upset that this particular individual was dealing drugs out of 2319 West Michigan Street #105 without STAIR's knowledge or permission ("then somebody is dealing under the table"). Because it was being done without STAIR's consent, STAIR wanted the individual removed from the unit. Case agents also believe that STAIR, although he assists drug dealers, does not wish to appear that he is accepting of flagrant drug dealing at his residences. For example, prior to MCDADE being arrested during the phone search of MCDADE's phone containing message between Russsell MCDADE's phone and **TARGET TELEPHONE 3,** there were messages wherein STAIR expressed concern about houses having too much activity. Case agents believe that STAIR knows he will likely incur a loss if the police are able to discover the drug issues and there is a nuisance property due to the complaints. Case agents believe that flagrant drug dealing from someone who is doing so "under the table" is something that STAIR would not be willing to tolerate.

36. On January 30, 2026, case agents began conducting regular surveillance at the address of 2319 West Michigan Street and continued to monitor court authorized intercepts.

**D. Surveillance at 2319 W Michigan Street**

37. On January 30, 2026. case agents conducted physical surveillance at 2319 W Michigan Street. Case agents observed a male in a blue Jacket first on the east side of 2319 W

Michigan Street, then walked to the front. The male was then observed meeting with a male with a black beard (later identified as Michael LIPSEY) and engaged in a hand-to-hand transaction that was witnessed by case agents. Based on my training and experience, this hand-to-hand transaction was consistent with a drug deal. Also observed in the front east side window of the building was a blue light that appeared to be Ring camera. Case agents also observed an unknown female engaging in the same routine of approaching the east side of 2319 W Michigan Street, then conducting a hand-to-hand transaction at the front vestibule with LIPSEY, who would later enter the first door on the northeast corner which was later determined to be apartment 2319 W. Michigan St. # 101. Based on my training and experience, these hand-to-hand transactions were consistent with a drug deal. Case agents also observed multiple subjects get the attention of persons inside the apartment by tapping on the windows, which would prompt an individual to come to the door and engaged in what appeared to be a hand-to hand transaction. Based on the intercepted call and messages between DALLAS and STAIR, and my training and experience, these hand to hand transactions at the window appeared to be consistent with a drug deal.

38. On January 31, 2026, case agents conducted surveillance at 2319 W Michigan Street, and observed a black Lincoln 4DR sedan, bearing Wisconsin license plate AYJ-3598 (Lincoln) arrive and park at the northeast corner of 2319 W Michigan Street. A black male, skinny, wearing all dark clothing appears from the east parking lot and enters the rear passenger side of the Lincoln. After a short period, the same black male exits the Lincoln and knocks on the window of the first floor northeast unit. Someone from inside moves the shades and has contact with the black male. At that time, the black male and the front seat passenger exit the Lincoln. The front passenger is a black female wearing a black jacket, with hood up and white/tan pants. Both

subjects enter the front lobby door of 2319 W Michigan Street. A short time later, the black female passenger of the Lincoln exited the front lobby door of 2319 W Michigan Street and entered the Lincoln. The Lincoln then departed the area. Based on these observations, the intercepts, training and experience, case agents believe there are multiple individuals working together, associated with the first floor northeast unit, in selling and distributing narcotics.

39. Case agents later observe a white Volkswagen Tiguan, bearing Wisconsin license plate ATA-6815 (Volkswagen) arrive and was occupied by two black males who conducted a hand-to-hand transaction with a heavy-set black male who exited the front entrance and met them in front of 2319 W. Michigan Street. Case agents also observed a black 2011 Chevrolet Traverse SUV, bearing Wisconsin license plate ASM-6690 (Traverse), which was reported stolen on January 29, 2026, arrive and a black male, 20's, skinny exited the driver seat and entered 2319 W Michigan Street. The Traverse driver exited a short time later and drove to the east parking lot of the building. The Traverse left the parking lot and returned minutes later, circled the area, and then departed west on W Michigan Street. Based on training, experience, and the investigation into the DTO, case agents believe this type of activity is consistent with street level narcotics dealers getting additional narcotics, also known as a "re-up." Case agents know based on prior experience that street level drug dealers will consistently drive areas and sell narcotics. After dealers have sold what they have on hand, they will return to their supplier, who is located at 2319 W Michigan Street, to retrieve additional narcotics to continue selling. Often, drug dealers will do this several times throughout the day and drive through the same area multiple times to ensure they are not being followed by law enforcement.

40. On January 31, 2026, case agents placed covert surveillance equipment on the street near 2319 W Michigan Street. The equipment observed the Lincoln arrive at the building and the rear passenger, a black male wearing black Nike hoodie with white swoosh, exits and enters the front lobby doors and exits in less than two minutes, departing the area in the Lincoln. Based on training, experience, and the investigation into the DTO and this location, case agents believe this short contact between the Lincoln rear passenger and the 2319 W. Michigan Street building to be consistent with a drug transaction. Later that day, surveillance equipment observed an elderly black male arrive to 2319 W Michigan Street and walk toward the front of the building. A tall black male, 40's, bald, wearing a white shirt and identified as the same male from surveillance on January 30, 2026, meeting with the Volkswagen occupants, exits 2319 W Michigan Street and starts yelling at the elderly black male. It appeared this male was expressing to the elderly black male he is not welcome at the location. The tall black male goes back into 2319 W Michigan Street, exits minutes later wearing a sweatshirt and appears to track down the elderly man who was arguing with him. Tall black male observed is later identified by case agents as LIPSEY.

41. On February 2, 2026, covert surveillance equipment observed a white male wearing a blue jacket, black ski mask, baggy pants, arrive on the front steps of 2319 W Michigan Street and waits while talking on his cellphone. LIPSEY appears and opens the front door, talks with the white male and lets him into the building. LIPSEY then opens the lobby door and looks up and down Michigan Street before going back inside. The white male exits within one minute. Based on the investigation, training, and experience, case agents believe this contact was a drug transaction. Specifically, LIPSEY looking outside the area to determine if possible individuals are observing him engaging in illegal drug trafficking and looking out for possible law enforcement in

the area. Further the short contact between the white male and LIPSEY at 2319 W Michigan Street is consistent with other short contact traffick observed by case agents that would be someone engaged in drug trafficking.

42. On February 3, 2026, case agents conducted physical surveillance of 2319 W Michigan Street and observed a hand-to-hand transaction with occupants of a white 2018 Volkswagen Tiguan, bearing Wisconsin license plate AXD-4747 (Tiguan). A female exited the Tiguan and went to the front vestibule of the apartment. LIPSEY motioned her to enter the building. The female exited within one minute. Based on training, experience, and the investigation into the DTO, this short meeting was consistent with a drug deal. Case agents notified the Milwaukee County Sheriff's Department (MCSO) of the transaction while maintaining surveillance of the Tiguan. A short time later, a MCSO Deputy initiated a traffic stop of the Tiguan for suspended license plates for emission suspension. The MCSO Deputy made contact with the Tiguan and identified the driver as Yaunda Sweet and the passenger as Leviticus D. Lipsey. Lipsey was found to be in possession of a plastic baggie containing one pink 10mg Oxycodone pill and one unmarked CVS pill bottle with seven green 15 mg Oxycodone pills. Lipsey claimed he was prescribed the medication for pain and just kept the pills on him that he planned to take for the day. They did not provide any information to where they came from when they were stopped. A consent search of the Tiguan was conducted, and no further evidence was located. Sweet advised she was a caretaker for Lipsey, who has medical problems. After the completion of the vehicle stop, the MCSO Deputy seized the Oxycodone pills and later placed them in evidence with the West Allis Police Department. Case agents believe that Lipsey

purchased the pills from 2319 W Michigan Street, based on the above described hand-to-hand transaction.

43. On February 4, 2026, case agents conducted physical surveillance at 2319 W Michigan Street and observed a grey Ford Flex, bearing no license plate, arrive and park in front of the 2319 W Michigan Street. Michael LIPSEY was observed exiting the front lobby door while talking on his cellphone. LIPSEY walked up to the passenger side door of the Ford Flex and conducted a hand-to-hand transaction with the driver of the Ford Flex. After the hand-to-hand transaction, LIPSEY looked into his hand at the suspected US Currency and placed it into his front right pant pocket. Based on the investigation, training, and experience, case agents believe this short, hand to hand contact was a drug transaction.

44. On February 5, 2026, case agents conducted physical surveillance at 2319 W Michigan Street. Case agents observed a black male open the front lobby door. A black female, 50's, exited the lobby door and was carrying a blanket. LIPSEY stuck his head out of the front lobby door and appeared to be looking up and down Michigan Street. As this occurred, a silver 2009 Chevrolet Impala, bearing Wisconsin license plate AWJ-8239 (Impala) arrive and park in front of the building. A black male, late 20's, short hair, wearing blue scrubs, exited the Impala and partially entered the front lobby door. The male conducted a hand-to-hand transaction with someone standing in the foyer and a baggie containing a white substance is observed inside the hand of the male in scrubs. As he walks back towards his Impala, he conceals the baggie into the front of his underwear. Based on the investigation, training, and experience, case agents believe this short, hand to hand contact with a white substance then being concealed, was a drug

transaction. Further, LIPSEY appeared to be looking for his drug customer when looking up and down Michigan Street.

45. On February 7, 2026, covert surveillance equipment near 2319 W Michigan Street observed a black male, 20's, wearing a dark colored jacket, hooded sweatshirt with white lettering on top and a winter cap with a tassel on top, enter the lobby of 2319 W Michigan Street and conduct a hand-to-hand transaction in the lobby and immediately depart the area. Based on the investigation, training, and experience, case agents believe this short, hand to hand contact was a drug transaction.

46. On February 8, 2026, covert surveillance equipment near 2319 W Michigan Street observed a black male, with shoulder length dreads, wearing grey hooded sweatshirt, dark jacket and winter cap, exit the front lobby door and enter the front seat of a red SUV. Approximately five minutes later the same suspect returned and met with someone in the lobby of 2319 W Michigan Street, conducted a hand-to-hand transaction and quickly left the building. Based on the investigation, training, and experience, case agents believe this short, hand to hand contact was a drug transaction. Covert surveillance later observed a white male, larger build, wearing all black, walk from the east parking lot and enter the front lobby. The male is observed meeting with LIPSEY at 2319 W Michigan Street. They conduct and hand-to-hand transaction and the male departs the area. Based on the investigation, training, and experience, case agents believe this short, hand to hand contact was a drug transaction.

47. Case agents conducted law enforcement database checks on LIPSEY. He is a convicted felon with prior drug arrests and was wanted by the Racine County Sheriff's Office for felony theft.

48. On March 4, 2026, case agents along with members of the North Central High Intensity Drug Trafficking Area (HIDTA), DCI, MCSO, and MPD conducted an arrest operation targeting LIPSEY. Case agents established surveillance at 2319 W Michigan Street and observed several hand-to-hand transactions, which based on the investigation, training, and experience, case agents believe the short, hand to hand contacts were likely drug transactions. Case agents also observed an unknown person open a window from the inside of apartment #101, which would be consistent with someone occupying the apartment. Case agents later observed LIPSEY depart 2319 W Michigan Street and walk to the rear of the building.

49. At approximately 1224 pm, LIPSEY was arrested for his warrant with Racine County outside 2319 West Michigan Street, Milwaukee, WI. LIPSEY identified his apartment as #105 and denied having control of apartment # 101. LIPSEY provided investigators with verbal consent to search apartment #105 and provided keys to #105 and (later determined) keys to apartments 206 and 101.[1] On LIPSEY's persons, case agents located set of keys (LIPSEY's right hand), wallet with content (LIPSEY's right rear pants pocket), and single Key that opened apartment #101 (tucked inside LIPSEY's black wallet). Also located on his person were two cellular telephones: a silver iPhone with beige phone case (Device A); and a silver Google cellphone with beige phone case (Device B) (collectively referred to as Target Devices). Case agents secured the Target Devices and preserved the Target to await proper extraction of evidence.

50. Upon entering apartment #105, it did not appear LIPSEY resided in apartment # 105. LIPSEY denied controlled or apartment # 101 and refused to provide consent. Investigators utilized LIPSEY's keys (from his person) and opened apartment # 101, to conduct a sweep of the

[1] Based on the investigation and surveillance of LIPSEY, case agents had no information connecting LIPSEY to apartment 206, so the decision was made to not search that location.

apartment in fear it was occupied and to prevent the destruction of evidence. During this sweep for persons at 2319 West Michigan Street, Apartment # 101 Milwaukee, Wisconsin, case agents observed items consistent with drug trafficking in plain view:

- box of baking soda (cooking agent for cocaine base);
- latex gloves;
- box of sandwich baggies, Social Security card for LIPSEY;
- commercial pesticide card for LIPSEY on the bed;
- small caliber handgun on a nightstand in the bedroom;
- extended magazine on the floor adjacent to the bed;
- digital scale;
- plastic baggie with suspected marijuana; and
- Tupperware (clear) containing baggie with suspected crack cocaine.

51. LIPSEY is a convicted felon and prohibited from possessing firearms. Based on the items viewed in plain view, case agents obtained a state search warrant for 2319 West Michigan Street, Apartment # 101 Milwaukee, Wisconsin. Case agents located the following items:

- a silver and black Taurus semi-automatic handgun, bearing serial number AEG507832,
- a G3C, 40 caliber Smith and Wesson, loaded with magazine with ammunition, located on nightstand, west of bed, in bedroom;
- a black 40 caliber extended magazine, loaded with ammunition, located on floor next to Aero bed in bedroom;
- 28.04 grams of suspected crack cocaine, inside knotted plastic sandwich baggie, located in clear tupperware with blue lid on floor next to bed in bedroom;
- 7.50 grams of suspected crack cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 7.50 grams of suspected crack cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 7.09grams of suspected cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 3.39 grams of suspected methamphetamine (crystalline), in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 9.06 grams of suspected crack cocaine, in clear square container with white lid on table near south wall in bedroom;

- 8.72grams of suspected crack cocaine, in clear round container with white lid, located on table near south wall in bedroom;
- 16.42 grams of suspected marijuana, in knotted plastic sandwich baggie, located on glass table near south wall in bedroom;
- A black/orange WeighMax digital scale located on glass table near south wall in bedroom'
- a razor blade and small spoon located inside clear tupperware with blue lid, which contained cocaine and methamphetamine, on floor next to bed in bedroom; and
- Multiple photographs of LIPSEY located on top of TV stand, closed and stacked, along north wall in living room.

52. Case agents know from training and experience that the above items are indicative of a place that is used for drug trafficking. Case agents know from training and experience that the total of approximately 60 grams of cocaine, 3.39 grams of methamphetamine are weights is indicative of someone who is not using but selling drugs for profit. Case agents know as well that the presence of a digital scale, firearm, spoon, razor blade, the separating of the cocaine into cocaine base and cocaine powder, the presence of baking soda, a well know cutting agent, are in totality all indicative of a drugs being prepared for sale. It should be noted that while case agents were waiting for the search warrant to be completed holding custody of the apartment, two customers came to the window in what appeared to be an attempt to purchase drugs. This belief is also because previous surveillance showed this is the way customers would approach the building prior to engaging in hand-to-hands with LIPSEY at the front foyer area. There was also located in the front window of apartment 101 a video doorbell system.

53. Following LIPSEY's arrest, case agents intercepted further communication between STAIR and DALLAS regarding drug trafficking at STAIR's property and text messages consistent with STAIR charging renters engaged in drug trafficking a higher rent. STAIR tells DALLAS to take the tenant's belongings out of apartment 101, change the locks, and put someone else in that

unit. STAIR states that DALLAS' name is on the lease so there is no issue with her removing the tenant's belongings and changing the locks.

54. Case agents also intercepted text messages between **TARGET TELEPHONE 3** (STAIR) and (414)-419-4993 (DALLAS). On March 6, 2026, DALLAS and STAIR texts:

> **DALLAS**: Why is 2319 w Michigan apt 105 $1500? He can't afford that he is handicap and in hospital again. He is not involved in drug dealing. I will recommend that he moves too. I don't want to be stuck owing that bill til he moves too.
> **STAIR**: Your people tend to be drug dealers its getting very annoying.
> **DALLAS**: The people who come from prison ministries are questionable but mostly we work with the community elderly and disabled. I don't intend to be a burden but we try to screen addicts, dealers from decent 20 year veterans. My accountant is working on making this account as smooth as possible.
> **STAIR**: Old people sell drugs. My first drug dealer that they busted in one of my Apartments when I only had 12 Apartments was in his sixties he actually had a stroke in jail after getting arrested
> **DALLAS**: The arresting officer called me for the names and my name. I cooperated and told him I lease several units. I'm careful to receive referrals from social workers and consultants who do extensive background checks.

Based on prior interceptions, training, experience, and the investigation into the DTO, case agents believe these messages demonstrate that STAIR knowingly rents to drug traffickers. Further these messages are consistent that STAIR allows drug traffickers to rent S2 Real Estate Properties but charges additional fees besides just the actual cost of rent ("Why is 2319 w Michigan apt 105 $1500? He can't afford that he is handicap and in hospital again. He is not involved in drug dealing"; and "Old people sell drugs. My first drug dealer that they busted in one of my Apartments when I only had 12 Apartments was in his sixties, he had a stroke in jail after getting arrested.").

55. Target Devices are presently in storage at the DCI, in Brookfield, Wisconsin. In my training and experience, I know that Target Devices have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when Target Devices first came into the possession of DCI when provided by case agents following the execution of a search warrant.

56. I know that persons (to include LIPSEY) who engage in ongoing criminal drug trafficking, utilize cellular devices to further their activities. I know that traffickers utilize cellular devices to maintain contact with other affiliates and store information relating to their trafficking offenses. I know that evidence of trafficking can be held on the photographs, videos, call logs, text messages, contact lists, and otherwise stored digital information. I know that drug traffickers often record images and/or videos depicting narcotic evidence, maintain contact with others regarding drug trafficking, through cellular devices which would be recorded in call logs and text messages, as well as maintain a contact list of affiliates within their cellular devices for personal reference and use. I know that additional evidence of drug trafficking would be stored within other digital stored memory of the cellular devices, and that law enforcement investigators could retrieve the electronically stored evidence if accessible.

57. The Target Devices are currently in the lawful possession of law enforcement and will be retrieved by case agents.

58. Based on my training and experience and work with fellow law enforcement, I know that this device has been stored in a way its contents are, to the extent material to this investigation, in substantially the same state as they were when the device first came into the possession of case agents.

## IV. TECHNICAL TERMS

59. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices

can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

60. Based on my training, experience, and research, I know that the Device have capabilities that allow it to serve as a wireless telephone, digital camera and video recorder, portable media player, internet web browser, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## A. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

61. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

62. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

63. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

64. *Manner of execution.* Because this warrant seeks only permission to examine the Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V. CONCLUSION

65. Based on the above information provided in this affidavit, I believe there is probable cause that the device contains evidence of possible crimes of felon in possession of a firearm; possession of a firearm in furtherance of drug trafficking; distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; use of a communication facility in furtherance of a drug trafficking offense; and maintain drug involved premises, violations of Title 18, United States Code Sections, 922(g) and 924(c); and Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, , Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, Antone A. ROSS, William D. ESKRIDGE, Raymond V. COWAN, RAYMONII Cowan, J.C., Dianne D. DALLAS, Michael LIPSEY and other identified and unidentified subjects (Target Subjects).

## ATTACHMENT A
**Property to Be Searched**

The property to be searched is two cellular phones recovered from the person of LIPSEY; during his arrest outside 2319 West Michigan Street, Milwaukee, Wisconsin, on March 4, 2026, more fully described as the following, hereinafter referred as the "Target Devices":

a. a silver iPhone with beige phone case (Device A); and
b. a silver Google cellphone with beige phone case (Device B).

The Target Devices are currently possessed by Wisconsin Division of Criminal Investigation, located in Brookfield, Wisconsin.

This warrant authorizes the forensic examination of the Target Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

# ATTACHMENT B

## Particular Things to be Seized

1. All records and information on the Target Devices described in Attachment A that relate to violations of felon in possession of a firearm; possession of a firearm in furtherance of drug trafficking; distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; use of a communication facility in furtherance of a drug trafficking offense; and maintain drug involved premises, violations of Title 18, United States Code Sections, 922(g) and 924(c); and Title 21, United States Code, Sections 841, 843(b), 846, and 856, including:

a. Preparatory steps taken in furtherance of these crimes;
b. Any audio, video, photograph(s) travel records, information related to the identity of co-conspirators, and any other content or records on the phone of criminal activity for the above offenses or of evidentiary value;
c. All voicemail and call records;
d. Electronic communications of any kind, including text messages, instant messages, social media, multimedia messaging, audio messages, voicemails, communications in third party apps, and emails, between Target Subjects and known or prospective customers of the crimes under investigation or concerning the crimes under investigation or others engaged in drug trafficking;
e. All call logs;
f. Contact list, to include names, addresses, phone numbers, and/or email addresses and records of communication with those contacts including call logs and written messages of any kind;
g. All social media sites used and applications for social media sites;
h. Lists of customers and related identifying information;
i. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
j. Types, quantities, and prices of firearms possessed;
k. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);
l. All bank records, checks, credit card bills, account information, and other financial records.
m. All internet activity, including all web browsing history;

n. Evidence of user attribution showing who used or owned the **Target Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, saved usernames and passwords, documents, and browsing history, user profiles, messaging logs, photographs, and correspondence;
o. Evidence of software that would allow others to control the phone, such as viruses, and other forms of malicious software;
p. Evidence indicating how and when the phone was accessed or used to determine the chronological context of access, use, and events relating to the crime under investigation and the user;
q. Records of or information about the computer's internet activity, such as firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;
r. Contextual information necessary to understand the evidence described in this attachment, such as contact lists, address books, and notes;
s. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, any downloaded applications and Internet Protocol addresses; and
t. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:
   i. records of Internet Protocol addresses used;
   ii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts. Pursuant to this warrant, the case agents may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.